**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THE UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF ILLINOIS et al.,

     Defendants.

No. 25 C 4811

Honorable Sharon Johnson Coleman

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
<u>AND IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

KWAME RAOUL
Attorney General of Illinois

Darren Kinkead
Samantha Sherman
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

LEGAL STANDARD ............................................................................................................. 5

ARGUMENT .......................................................................................................................... 6

I.     The federal government is not likely to succeed on the merits because it has failed to state a claim upon which relief can be granted. ............................................. 6

      A.     Congress has not preempted the challenged provisions of the Privacy Act through a direct statement in the text of federal law. ................................. 7

      B.     Congress has not ousted the states from regulating in a relevant field. ............... 10

           1.     Field preemption is rare and faces an especially high hurdle in the field of employment, which traditionally is occupied by the states.......... 10

           2.     Congress did not intend to occupy the field of "administrative processes governing Form I-9 documentation and inspection." ............... 13

           3.     Congress did not intend to occupy the field of "administrative processes governing E-Verify." ................................................................ 14

      C.     The challenged provisions of the Privacy Act are not an obstacle to the accomplishment and execution of Congress's full purposes and objectives. ....... 17

           1.     The federal government cannot show that the challenged provisions of the Privacy Act cause major damage to substantial federal interests. ........................................................................................ 17

           2.     Mere differences between state and federal law are insufficient to establish conflict preemption. .................................................................. 19

           3.     A hypothetical conflict is insufficient to preempt state law. ..................... 21

II.    The federal government has not submitted evidence supporting its assertion that it is likely to suffer irreparable harm in the absence of an injunction. ................................. 25

III.   The equities and public interest weigh heavily against preliminary relief. ...................... 27

CONCLUSION ........................................................................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ........................................................................... 6, 28

*Altria Group v. Good*,
  555 U.S. 70 (2008) ........................................................................................ 10, 11

*Arizona v. United States*,
  567 U.S. 387 (2012) ..................................................................... 11, 13, 15, 16, 20

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015) ....................................................................................... 6, 26

*Association of American Publishers, Inc. v. Frosh*,
  586 F. Supp. 3d 379 (D. Md. 2022) ..................................................................... 26

*Aux Sable Liquid Products v. Murphy*,
  526 F.3d 1028 (7th Cir. 2008) ............................................................................. 19

*Bost v. Illinois State Board of Elections*,
  114 F.4th 634 (7th Cir. 2024) ............................................................................... 2

*C.Y. Wholesale, Inc. v. Holcomb*,
  965 F.3d 541 (7th Cir. 2020) ......................................................... 7, 10, 18, 25

*California v. ARC America Corp.*,
  490 U.S. 93 (1989) .............................................................................................. 18

*Camps Newfound/Owatonna, Inc. v. Harrison*,
  520 U.S. 564 (1997) ............................................................................................ 12

*Chamber of Commerce of the United States of America v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ........................................................................... 8, 9

*Chamber of Commerce of the United States of America v. Whiting*,
  563 U.S. 582 (2011) ........................................................... 8, 9, 15, 16, 18

*Chen v. The GEO Group, Inc.*,
  287 F. Supp. 3d 1158 (W.D. Wash. 2017) ............................................................ 9

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) ......................................................... 18, 20, 22, 25

*DeCanas v. Bica,*
    424 U.S. 351 (1976)............................................................................11, 12, 16

*Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety &*
    *Homeland Security,* 108 F.4th 194 (3d Cir. 2024) ........................... 27

*Doe v. University of Southern Indiana,*
    43 F.4th 784 (7th Cir. 2022)........................................................... 26

*English v. General Electric Co.,*
    496 U.S. 72 (1990) ........................................................... 19, 21, 23

*Florida Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963)....................................................................... 12

*Freightliner Corp. v. Myrick,*
    514 U.S. 280 (1995)....................................................................... 17

*Geier v. American Honda Motor Co.,*
    529 U.S. 861 (2000)....................................................................... 18

*Georgia Latino Alliance for Human Rights v. Governor,*
    691 F.3d 1250 (11th Cir. 2012) ...................................................... 16

*Hillsborough County v. Automated Medical Laboratories, Inc.,*
    471 U.S. 707 (1985)....................................................................... 13

*Hines v. Davidowitz,*
    312 U.S. 52 (1941)........................................................11, 13, 15, 16

*Illinois Bankers Association v. Raoul,*
    760 F. Supp. 3d 636 (N.D. Ill. 2024) ............................................. 26

*Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.,*
    157 F.3d 500 (7th Cir. 1998) .......................................................... 27

*Illinois Republican Party v. Pritzker,*
    973 F.3d 760 (7th Cir. 2020) ..................................................... 22, 23

*Kansas v. Garcia,*
    589 U.S. 191 (2020)........................... 7, 10, 12, 13, 14, 15, 17, 18, 23

*Kurns v. Railroad Friction Products Corp.,*
    565 U.S. 625 (2012)....................................................................... 12

*Lozano v. Hazleton*,
 724 F.3d 297 (3d Cir. 2013) ................................................................. 22

*Maryland v. King*,
 567 U.S. 1301 (2012) ........................................................................... 27

*McHenry County v. Raoul*,
 44 F.4th 581 (7th Cir 2022) ........................................... 17, 19, 21, 22

*McKenzie v. Chicago*,
 118 F.3d 552 (7th Cir. 1997) ............................................................... 28

*Michigan v. United States Army Corps of Engineers*,
 667 F.3d 765 (7th Cir. 2011) ............................................................... 27

*MITE Corp. v. Dixon*,
 633 F.2d 486 (7th Cir. 1980) ............................................................... 19

*Montana Medical Association v. Knudsen*,
 119 F.4th 618 (9th Cir. 2024) .............................................................. 19

*Murphy v. NCAA*,
 584 U.S. 453 (2018) ............................................................................... 7

*Neitzke v. Williams*,
 490 U.S. 319 (1989) ............................................................................... 6

*Nelson v. Great Lakes Educational Loan Services, Inc.*,
 928 F.3d 639 (7th Cir. 2019) ............................................................... 11

*New York State Department of Social Services v. Dublino*,
 413 U.S. 405 (1973) ............................................................................. 15

*Novoa v. The GEO Group, Inc.*,
 No. 17-cv-2514, 2018 WL 3343494 (N.D. Cal. June 21, 2018) ......................... 9

*Papasan v. Allain*,
 478 U.S. 265 (1986) ............................................................................... 6

*Patriotic Veterans, Inc. v. Indiana*,
 736 F.3d 1041 (7th Cir. 2013) ......................................................... 7, 10

*Petr v. BMO Harris Bank N.A.*,
 95 F.4th 1090 (7th Cir. 2024) ................................................... 18, 21, 25

*Protect Our Parks, Inc. v. Buttigieg*,
    39 F.4th 389 (7th Cir. 2022) ........................................................................ 6

*Rice v. Norman Williams Co.*,
    458 U.S. 654 (1982) ...................................................................... 18, 21, 23

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984) .................................................................................. 18

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    145 S. Ct. 1556 (2025) ........................................................... 6, 22, 23

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) .................................................................................... 5

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ................................................................. 9

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024) ............................................................... 11, 16

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019) ........................................................... 7, 11, 13

*Washington v. The GEO Group, Inc.*,
    283 F. Supp. 3d 967 (W.D. Wash. 2017) ................................................. 9

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 26

*Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*,
    134 F.4th 326 (5th Cir. 2025) ................................................................. 18

**Constitutional Provisions**

U.S. const. art. VI, cl. 2 ..................................................................................... 6

**Statutes**

8 U.S.C. § 1324a ........................................... 2, 7, 8, 12, 13, 19, 22, 25

730 ILCS 5/5-4.5-75 ...................................................................................... 5

820 ILCS 55/12 ........................................................................ 1, 3, 4, 5, 15

820 ILCS 55/13 ...................................................................... 1, 4, 5, 14, 25

820 ILCS 55/15 ................................................................................................... 5, 15

**Regulations**

8 C.F.R. § 274a.2 ............................................................................................... 24

**Rules**

Fed. R. Civ. P. 12 ................................................................................................. 6

Fed. R. Evid. 201 ................................................................................................. 2

**Other Authorities**

Illinois Department of Labor, "Right to Privacy in the Workplace/E-Verify Frequently
     Asked Questions" ......................................................................................... 4

Illinois Public Act 96-623 ............................................................................... 3, 21

Illinois Public Act 103-879 ................................................................................. 3

Public Law 104-208, § 402 ................................................................................ 22

Public Law 104-208, § 403 ............................................................... 2, 14, 15, 22, 28

Public Law 104-208, § 404 ............................................................................ 4, 14

U.S. Citizenship and Immigration Services, "E-Verify Performance" ............................. 3

U.S. Citizenship and Immigration Services, "E-Verify Usage Statistics" ...................... 22

U.S. Citizenship and Immigration Services, "Handbook for Employers M-274" ................. 24

U.S. Citizenship and Immigration Services, "M-775, E-Verify User Manual" ................. 2, 4

U.S. Citizenship and Immigration Services, "Summary of the Evaluation of the Accuracy
     of E-Verify Findings" (2012) ........................................................................ 3

U.S. Citizenship and Immigration Services, "Westat Evaluation of the E-Verify Program:
     USCIS Synopsis of Key Findings and Program Implications" (2010) ......................... 3

U.S. Immigration and Customs Enforcement, "Form I-9 Inspection" ....................... 24, 28

## INTRODUCTION

The Right to Privacy in the Workplace Act ("Privacy Act") sets out basic protections for Illinois workers who provide sensitive personal information to employers for the purpose of verifying their eligibility to work in the United States. 820 ILCS 55/12 & 13. These provisions ensure that Illinois residents who have the right to work in this country—either because they are American citizens or because they are noncitizens who are authorized to work under federal law—are not harmed by any lax data security practices, improper denials of employment based on erroneous records, or other misuses or abuses of the sensitive personal information collected for employment authorization verification.

The federal government thinks that these protections are preempted by federal immigration law. Applying a kitchen-sink approach, it trots out arguments under every category of preemption: express, field, and conflict. All of them fail. There is no express preemption because the specific type of state regulations Congress has expressly precluded—state-level civil and criminal penalties for employing unauthorized workers—bear no resemblance to the Privacy Act's protections for Illinois workers deprived of employment because of erroneous data. Nor is this one of those rare cases in which Congress has regulated so extensively in a particular field that state regulation is implicitly impermissible. Quite the contrary: an employer's obligations to potential and current employees are a longstanding domain of state regulation. Lastly, the federal government's conflict preemption theory—that the Privacy Act dissuades Illinois employers from participating in E-Verify, a voluntary federal information-sharing program—rests solely on unsubstantiated speculation. Far more is required, however, to overcome the presumption against preemption afforded to state laws in our federalist system. The preliminary injunction motion should be denied, ECF 18, and the complaint should be dismissed with prejudice, ECF 1.

## BACKGROUND

Federal law requires employers to verify that newly hired employees are not "unauthorized alien[s]." 8 U.S.C. § 1324a(a); *see id.* § 1324a(h)(3). This means all employees must complete a Form I-9 attesting to their citizenship or immigration status and provide certain documents for their employers' examination that establish their eligibility to work: perhaps a social security card, passport, or birth certificate. *Id.* § 1324a(b). Employers may also choose to use E-Verify, an online system that compares the information on an employee's Form I-9 to records from the Social Security Administration and the Department of Homeland Security. *See* Public Law 104-208, § 403. If E-Verify is unable to "match" the employee's Form I-9 information to the federal government's records, it sends the employer a "Tentative Nonconfirmation (Mismatch)" result. Federal law requires the employer to notify the employee of the tentative nonconfirmation and the right to contest it. Public Law 104-208, § 403(a)(4)(B)(i). If the employee contests the tentative nonconfirmation, the employer "may not terminate, suspend, delay training, withhold or lower pay, or take any other adverse action against an employee" unless and until the employer receives a "final nonconfirmation notice."[1]

The Form I-9 and E-Verify processes are not foolproof. Employees are at risk of identity theft and related harms if their employers do not take basic precautions to protect the sensitive data they've provided to establish their work eligibility. More immediately, the federal government's own records establish that E-Verify sometimes issues tentative and even final

---

[1] U.S. Citizenship and Immigration Services, "M-775, E-Verify User Manual," § 3.3, e-verify.gov/e-verify-user-manual (all websites lasted visited on June 23, 2025). The Court may take judicial notice of information from the federal government's own websites explaining the operations of the Form I-9 and E-Verify processes in resolving both the preliminary injunction motion and the motion to dismiss. *E.g.*, *Bost v. Illinois State Board of Elections*, 114 F.4th 634, 642 n.2 (7th Cir. 2024). The "accuracy" of this information "cannot reasonably be questioned," *see* Fed. R. Evid. 201(b)(2), because, among other things, the federal government cites these same websites in both its complaint and preliminary injunction motion, *see, e.g.*, ECF 1, ¶ 22 n.5, ¶ 25 n.6, ¶ 33; ECF 18 at 5-6.

2

nonconfirmations to American citizens and others who are authorized to work.[2] There are many reasons why this can happen: the employee's name may have changed, the employer may have entered the employee's information incorrectly on Form I-9 or in E-Verify, or it may even be the case that the federal government's own records are wrong. And these are not isolated incidents: the official E-Verify website reports that, for fiscal year 2024, at least 72,121 people who received tentative nonconfirmations were, in fact, ultimately found to be authorized to work.[3]

When American citizens are wrongly prevented from earning a living in Illinois, it causes immense harm, not only to the workers themselves, but to their families and communities as well. That's why the Illinois legislature enacted the challenged portions of the Privacy Act: to provide basic protection for employees during the process of verifying their employment eligibility. Many of these provisions have been in place for as long as fifteen years.[4]

First, the Privacy Act requires employers to take precautions to safeguard the sensitive personal information that new hires provide to verify their citizenship or immigration status— and to ensure that the information is not misused. 820 ILCS 55/12(c)(7). Consistent with this purpose, the state law forbids employers from allowing their employees tasked with confirming new hires' work eligibility to access E-Verify without first completing the federally required training. *Id.* 12(c)(3). And employers must "take reasonable steps" to prevent those employees

---

[2] U.S. Citizenship and Immigration Services, "Summary of the Evaluation of the Accuracy of E-Verify Findings" at 1-3 (2012), e-verify.gov/sites/default/files/everify/data/SumFindingsEVerifyAccuracy Eval2012.pdf; U.S. Citizenship and Immigration Services, "Westat Evaluation of the E-Verify Program: USCIS Synopsis of Key Findings and Program Implications" at 2 (2010), uscis.gov/sites/default/files/ document/reports/ Westat%20Evaluation%20of%20the%20E-Verify%20Program.pdf.

[3] U.S. Citizenship and Immigration Services, "E-Verify Performance," e-verify.gov/about-e-verify/e-verify-data/e-verify-performance.

[4] The federal government calls the Privacy Act "SB0508" in reference to a bill, enacted last year, that added section 13 to the statute effective January 2025. *See* Illinois Public Act 103-879. But section 12 of the Privacy Act has been in place in nearly identical form since 2010. *See* Illinois Public Act 96-623.

from evading this requirement by using someone else's username or password. *Id.*

Second, the Privacy Act requires employers to inform employees regarding when and how their sensitive personal information will be used. For example, employers must announce that they participate in E-Verify by displaying federally required notices "in a prominent place that is clearly visible to both prospective and current employees." 820 ILCS 55/12(c)(1). The state law also requires employers to provide notice of upcoming Form I-9 inspections, unless federal law requires otherwise or the federal government "express[ly] and specific[ally] direct[s] or request[s]" the employer not to do so. *Id.* 13(e), (h).

Third, the Privacy Act ensures that employers do not misuse or abuse the employment verification process to discriminate against or otherwise unfairly harm employees. For example, employers may not use E-Verify to illegally "pre-screen" job applicants, 820 ILCS 55/12(c)(4), and may not "terminate an employee or take any other adverse employment action against an individual prior to receiving a final nonconfirmation notice," *id.* 12(c)(5). In addition, the state law prohibits employers from "impos[ing] work authorization verification or re-verification requirements greater than those required by federal law," such as requiring an employee to present a passport when other forms of documentary evidence would suffice. *Id.* 13(b).[5]

Fourth, the Privacy Act ensures that employees know they have the right to contest an erroneous determination that they are not authorized to work. Erroneous determinations must be quickly challenged to avoid termination of employment. Public Law 104-208, § 404(c).[6] State law thus requires employers using E-Verify to provide timely written notice to their employees of

---

[5] Section 13(b) of the Privacy Act does not forbid employers to use E-Verify. Illinois Department of Labor, "Right to Privacy in the Workplace/E-Verify Frequently Asked Questions," at Question 4, labor.illinois.gov/faqs/right-to-privacy-in-the-workplace-e-verify.html.

[6] *See also* U.S. Citizenship and Immigration Services, "M-775, E-Verify User Manual," § 3.3, e-verify.gov/e-verify-user-manual.

a tentative nonconfirmation and the right to contest it. 820 ILCS 55/12(c)(6). There are other ways in which federal officials may call into question an employee's employment eligibility—for instance, during a Form I-9 inspection. The Privacy Act says that, if federal officials "make[ ] a determination that the employee's work authorization documents do not establish that the employee is authorized to work in the United States," or otherwise notify the employer "of a discrepancy as it relates to work authorization," then the employer must promptly provide a written notice to the employee explaining the right to contest those determinations, *id.* 13(d), 13(g), except as otherwise required by federal law or by the "express and specific direction or request" of the federal government, *id.* 13(h). And, when permitted by federal law, the employer must give the employee a copy of the relevant determination. *Id.* 13(c)(1), 13(g)(4).

Lastly, section 15 of the Privacy Act sets out mechanisms for enforcing these provisions of the statute (and many others that the federal government does not challenge). Employees who believe they have been denied rights under the Privacy Act may file complaints with the Illinois Department of Labor. 820 ILCS 55/15(b). If the department finds that the employer violated the statute, and attempts to resolve the violation fail, then the department may commence litigation in state court. *Id.* The employee may also sue over the alleged violation if the department declines. *Id.* 15(c). An employee who prevails may be awarded damages and costs. *Id.* 15(d)(1). For willful and knowing violations, the Privacy Act also authorizes an award of attorney's fees, plus penalties ranging from $200 to $10,000. *Id.* 15(d)(2), (3), (4). And a violation of the statute is a petty offense, *id.* 15(e), punishable by up to a $1,000 fine, 730 ILCS 5/5-4.5-75(a).

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). "For a preliminary

injunction to issue, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*, 75 F.4th 760, 766-67 (7th Cir. 2023). A plaintiff seeking preliminary relief needs to "make a 'strong' showing of likelihood of success." *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022).

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." "Although for the purposes of [a] motion to dismiss [the Court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Plus, factual allegations based on mere "speculation" are "not enough" to survive "a motion to dismiss." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1568 (2025). When "a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate." *Neitzke v. Williams*, 490 U.S. 319, 320 (1989).

## ARGUMENT

### I.   The federal government is not likely to succeed on the merits because it has failed to state a claim upon which relief can be granted.

The supremacy clause of the United States constitution "creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.' They must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (quoting U.S. const. art. VI, cl. 2). A state law that conflicts with a federal law is said to be preempted.

There are two categories of preemption: express and implied. And there are two

subcategories of implied preemption: field and conflict. But "all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). Another "feature unites them [too]: Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019). Rather, "[i]n all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Here, the federal government pursues all three preemption theories but fails to state a claim under any.

### A.    Congress has not preempted the challenged provisions of the Privacy Act through a direct statement in the text of federal law.

The federal government first asserts that certain provisions of the Privacy Act are expressly preempted by 8 U.S.C. § 1324a(h)(2), which displaces "any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." But this argument holds no water: the Privacy Act does not impose sanctions for employing unauthorized aliens.

"Express preemption exists when Congress 'declares its intention to preempt state regulation through a direct statement in the text of federal law.'" *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 546 (7th Cir. 2020). "[G]iven the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). The only federal statutory provision that the federal government relies on in support of its express preemption claim is section 1324a(h)(2); it insists

that this clause expressly preempts sections 13(h) and 15(b)-(f) of the Privacy Act because they "impose both criminal and civil penalties on employers of unauthorized aliens." ECF 18 at 11.

This is plainly not the case. Sections 13(h) and 15(b)-(f) authorize criminal and civil penalties only for certain "violations" of the Privacy Act. And it is not a violation of the Privacy Act to "employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). In other words, a person's immigration or work authorization status is irrelevant to determining whether an employer has committed any offense under the Privacy Act: an employer can violate the state law regardless of whether its employees are American citizens, legal permanent residents, nonpermanent residents with work authorization, or "unauthorized aliens." As explained, *all* Illinois residents seeking employment are put at risk if employers misuse or abuse employment verification processes and tools. The challenged provisions of the Privacy Act "regulate the employment relationship to protect workers within the State" from these harms. *Chamber of Commerce of the United States of America v. Whiting*, 563 U.S. 582, 588 (2011). These goals have nothing to do with punishing those who employ unauthorized aliens, and state law does not impose sanctions for "employ[ing], recruit[ing] or refer[ring] for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). The challenged provisions of the Privacy Act thus do not regulate the conduct that Congress has said it alone may regulate.

The fact that the "employment of an unauthorized alien is irrelevant in determining whether an employer has violated" the Privacy Act is what differentiates it from the laws invalidated in the cases cited by the federal government. *Chamber of Commerce of the United States of America v. Edmondson*, 594 F.3d 742, 766 (10th Cir. 2010). Indeed, all the federal government's citations in support of its express preemption argument involve state laws in which employing an unauthorized alien was an element of the offense. *See United States v. Alabama*,

691 F.3d 1269, 1288-90 (11th Cir. 2012) (Alabama law prohibiting making tax deductions for "compensation paid to unauthorized aliens" and making it a "'discriminatory practice'" to fire an American citizen while "employing an unauthorized alien employee"); *Edmondson*, 594 F.3d at 754 (similar); *see also Whiting*, 563 U.S. at 587 (Arizona law suspending licenses of employers that "knowingly or intentionally employ unauthorized aliens" would be expressly preempted under section 1324a(h)(2) if not for savings clause permitting "licensing" laws). The obligations imposed by the Privacy Act neither permit nor prohibit an employer from hiring a person who lacks federal work authorization.

The federal government ignores this obvious distinction between the Privacy Act and the state laws in its cited cases. That is because there is simply no colorable argument that section 1324a(h)(2) expressly preempts state-law sanctions that are not in any way "contingent on the employment of an unauthorized alien." *Edmondson*, 594 F.3d at 766. It cannot be the case, for example, that section 1324a(h)(2) preempts virtually all state employment laws—such as wage-and-hour laws, health and safety standards, data privacy laws, paid leave requirements, and so forth—because of the mere possibility that those laws may incidentally "impos[e] civil or criminal sanctions" on employers who also happen to "employ . . . unauthorized aliens." Unsurprisingly, it appears that every court to consider this strained interpretation of section 1324a(h)(2) has rejected it. *See Edmondson*, 594 F.3d at 766; *Novoa v. The GEO Group, Inc.*, No. 17-cv-2514, 2018 WL 3343494, at *3 (N.D. Cal. June 21, 2018); *Chen v. The GEO Group, Inc.*, 287 F. Supp. 3d 1158, 1164 (W.D. Wash. 2017); *Washington v. The GEO Group, Inc.*, 283 F. Supp. 3d 967, 975-76 (W.D. Wash. 2017).

Even if this were a close call (it's not), the Supreme Court and Seventh Circuit have repeatedly instructed that "[w]hen interpreting ambiguous statutes, courts favor the interpretation

that does not preempt state law." *C.Y. Wholesale*, 965 F.3d at 546; *see Altria Group v. Good*, 555 U.S. 70, 77 (2008) ("[W]hen the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"); *Patriotic Veterans*, 736 F.3d at 1046 (same). Applying this presumption against preemption, the best interpretation of section 1324a(h)(2) is that it preempts only state laws that impose sanctions on employers **because** they employed "unauthorized aliens"; not that it broadly invalidates state laws even when an employee's authorization status is immaterial to the statutory scheme. The express preemption claim fails and cannot be grounds for a preliminary injunction.[7]

### B. Congress has not ousted the states from regulating in a relevant field.

Perhaps recognizing the futility of its express preemption argument, the federal government pivots quickly to a bold alternative: that this is one of those "rare cases" in which the text and structure of a federal statute evidence Congress's implicit intent to "oust[ ] the States from regulating in a[n] [entire] field." *Kansas*, 589 U.S. at 208. But this argument faces insurmountable hurdles. Field preemption is highly unusual and requires unmistakable evidence of congressional intent. But the challenged portions of the Privacy Act regulate the field of employment, which is traditionally occupied by the states. And the plain language of federal law does not evidence any congressional desire to prevent state regulation in this traditional field.

### 1. Field preemption is rare and faces an especially high hurdle in the field of employment, which traditionally is occupied by the states.

"The intent to displace state law altogether can be inferred from [1] a framework of regulation so pervasive that Congress left no room for the States to supplement it or [2] where there is a federal interest so dominant that the federal system will be assumed to preclude

---

[7] Because the text of section 1324a(h)(2) establishes that it does not preempt any portion of the Privacy Act, there's no need to address whether the exception for "licensing and similar laws" applies here.

enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). But these inferences must be drawn from the text and structure of a validly enacted federal statute; field preemption does not authorize courts "to elevate abstract and unenacted legislative desires above state law." *Virginia Uranium*, 587 U.S. at 778. What's more, courts assume "that the historic police powers of the States are not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress"—an assumption that "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Group*, 555 U.S. at 77 (cleaned up).

The federal government's field preemption argument faces an uphill slog from the outset. To be sure, the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). "But the [Supreme] Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *Id.* at 356. To the contrary, courts have been reluctant to find field preemption in the immigration context. The Supreme Court has twice held that Congress intended to occupy the field of "alien registration"—that is, "maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders"—because such a scheme necessarily "touche[s] on foreign relations." *Arizona*, 567 U.S. at 400-03; *see Hines v. Davidowitz*, 312 U.S. 52 (1941). But "[t]he Supreme Court has never extended field preemption to any part of the immigration laws beyond alien registration." *United States v. Texas*, 97 F.4th 268, 298 (5th Cir. 2024) (Oldham, J., dissenting); *see Nelson v. Great Lakes Educational Loan Services, Inc.*, 928 F.3d 639, 652 (7th Cir. 2019) ("[f]ield preemption is confined to only a few areas of the law").

What the Supreme Court **has** done, by contrast, is to emphasize that "States possess

11

broad authority under their police powers to regulate the employment relationship to protect workers within the State"—even when state laws directly regulate in the field of immigration. *DeCanas*, 424 U.S. at 356. On this basis, the court held five decades ago that the Immigration and Nationality Act did not evidence any congressional intent "to oust state authority to regulate the employment" of people unlawfully present in this country. *Id.* at 357-60.

Subsequently, of course, Congress overruled *DeCanas* by enacting the express preemption clause discussed above that explicitly displaces some state laws punishing those who employ "unauthorized aliens." 8 U.S.C. § 1324a(h)(2). But this only proves the point: when a state law "is an exercise of the 'historic police powers of the States,'" it takes "an unambiguous congressional mandate" like the sort now found in section 1324a(h)(2) for a court to set the state law aside. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146-47 (1963). In other words, when state power to regulate employment brushes up against federal power to regulate immigration, the latter trumps the former only if Congress compels it with crystal clarity. *See Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 640-41 (2012) (Sotomayor, J., concurring in part and dissenting in part) ("'our recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it'") (quoting *Camps Newfound/Owatonna, Inc. v. Harrison*, 520 U.S. 564, 617 (1997) (Thomas, J., dissenting)).

Despite this unpromising landscape, the federal government insists that "federal law occupies[ ]" the field of "administrative processes governing Form I-9 documentation and inspection and E-Verify." ECF 18 at 14. As the federal government sees it, this mouthful of a field is governed by "a comprehensive framework of [federal] regulation so pervasive that Congress left no room for the States to supplement it." *Id.* at 16 (cleaned up). But this does not follow from "'the text and structure of the statute at issue.'" *Kansas*, 589 U.S. at 208.

**2.  Congress did not intend to occupy the field of "administrative processes governing Form I-9 documentation and inspection."**

To evaluate the federal government's argument, it makes sense to distinguish between the administrative processes governing Form I-9 and E-Verify, since they derive from distinct statutory frameworks. Start with Form I-9. Federal law prescribes that an employer "must attest, under penalty of perjury and on a form designated or established by the Attorney General by regulation, that it has verified that [an employee] is not an unauthorized alien by examining" specified documents. 8 U.S.C. § 1324a(b)(1)(A). The employee must also attest that he is authorized to work in this country. *Id.* § 1324a(b)(2). The employer is required to retain both forms and make them available for inspection by federal officers. *Id.* § 1324a(b)(3).

All of this takes up just a few hundred words in section 1324a(b) alone. It's hardly comparable to the "'single integrated and all-embracing system'" of "alien registration"—and certainly cannot be said to "touch[ ] on" any "foreign relations" concerns. *Arizona*, 567 U.S. at 400 (citing *Hines*, 312 U.S. at 74). Beyond asserting that section 1324a(b) is "comprehensive," the federal government does not explain how the statute reflects Congress's intent to clear the entire field: "Here, no more than in any statutory interpretation dispute, is it enough for any party or court to rest on a supposition (or wish) that 'it must be in there somewhere.'" *Virginia Uranium*, 587 U.S. at 767; *see Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 717 (1985) ("merely because the federal provisions [are] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field").

More fundamentally, though, the challenged provisions of the Privacy Act are "not part of" the field of "administrative processes governing Form I-9 documentation and inspection." *Kansas*, 589 U.S. at 208. The state law simply requires employers to notify employees upon

13

learning that something may be amiss with their work authorization documents, 820 ILCS 55/13(c), (d), (g), or if federal officials conduct a Form I-9 inspection, *id.* 13(f). The state law does not regulate which documents are acceptable to establish work authorization or how federal officials conduct Form I-9 inspections; it only addresses the exchange of information between employers and employees relating to the very essence of an employment relationship. And just as "federal [immigration] law does not create a comprehensive and unified system regarding the information that a State may require employees to provide" to employers, so too federal immigration law does not create a comprehensive and unified system regarding the information that a state may require employers to provide to employees. *Kansas*, 589 U.S. at 210.

### 3. Congress did not intend to occupy the field of "administrative processes governing E-Verify."

The federal government fares no better with its argument based on the field of "administrative processes governing E-Verify." Employers that choose to participate in E-Verify must obtain certain information about their employees beyond what is required on Form I-9. Public Law 104-208, § 403(a)(1), (2). Employers must then use E-Verify to "seek confirmation of the [employee's] identity and employment eligibility." *Id.* § 403(a)(3). If the employee's identity and work eligibility are confirmed, the employer must note this on Form I-9. *Id.* § 403(a)(4)(A). If an employer "receives a tentative nonconfirmation of an [employee's] identity or work eligibility," however, it must "inform the [employee] for whom the confirmation is sought." *Id.* § 403(a)(4)(B)(i). The employee may choose to contest the tentative nonconfirmation by obtaining a "secondary verification." *Id.* § 403(a)(4)(B)(iii); *see id.* § 404(c). "The nonconfirmation will remain tentative until a final confirmation or nonconfirmation is provided by the" secondary verification process, and the employee may not "terminate employment of an individual because of a failure of the individual to have identity and work

14

eligibility confirmed . . . until a nonconfirmation becomes final." *Id.* § 403(a)(4)(B)(iii). A fine may be assessed against any employer that fails to provide notice to an employee upon receiving a tentative nonconfirmation of the employee's identity or work eligibility. *Id.* § 403(a)(4)(C)(ii).

Here, at least, the challenged provisions of the Privacy Act do regulate the field of "administrative processes governing E-Verify": the state law complements these procedures by imposing penalties on employers enrolled in the E-Verify program that terminate employees based on a tentative nonconfirmation in violation of federal law—or that fail to provide the federally required notice of the employee's "right to contest the tentative nonconfirmation notice." 820 ILCS 55/12(c)(5), (6); *see id.* 15(c), (d), (e).

The problem for the federal government is that it has (again) failed to explain why it thinks Congress intended to displace all state laws regulating the field of "administrative processes governing E-Verify." *See Whiting*, 563 U.S. at 608 (federal law "setting up" E-Verify "contains no language circumscribing state action"). Those processes are succinctly set forth in section 403(a) of Public Law 104-208, which, unlike the provisions of federal law governing alien registration, is not all-encompassing and does not implicate our nation's foreign relations. *See Arizona*, 567 U.S. at 400; *Hines*, 312 U.S. at 74. To be sure, section 403(a) may be "comprehensive" in the sense that it comprises an internally consistent regulatory scheme that appears to be complete on its face. But this alone is not sufficient to trigger field preemption; almost all legislation satisfies this definition. Field preemption, by contrast, is "rare," so something more than legislative coherence is required to establish Congress's intent to "oust[ ] the States from regulating in a[n] [entire] field." *Kansas*, 589 U.S. at 208; *see New York State Department of Social Services v. Dublino*, 413 U.S. 405, 415 (1973) (rejecting "contention that pre-emption is to be inferred merely from the comprehensive character of" federal law because

15

"subjects of modern" regulation often require "complex responses" "without Congress necessarily intending its enactment as the exclusive means of meeting the problem").

And something ***significantly*** more would be required to establish field preemption here because, as explained, the federal E-Verify program operates in the field of employment, which traditionally has been occupied by state law. *E.g.*, *DeCanas*, 424 U.S. at 356. "Only a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify that conclusion." *Id.* at 357 (cleaned up). But the federal government has not located any such congressional intent in the text or structure of section 403(a)—or elsewhere in the Immigration and Nationality Act. This should not come as a surprise: the Supreme Court has held that states are not preempted from mandating E-Verify use (for all employers or a subset) even though federal law makes the program voluntary. *Whiting*, 563 U.S. at 607-10. It would be an odd outcome if states could require employers to use E-Verify in a ***different*** way than Congress did— but could not require employers to use E-Verify in the ***same*** way that Congress did.

The federal government's out-of-circuit cases confirm this conclusion. The Fifth Circuit's holding that "Congress intended to 'occupy the field' of immigration policies concerning entry into and removal from the United States" relies on its finding that this field implicates the exclusive federal "power 'to control and conduct relations with foreign nations.'" *Texas*, 97 F.4th at 278, 283-84. That aligns with the Supreme Court's reasoning regarding the field of alien registration in *Arizona*, 567 U.S. at 400, and *Hines*, 312 U.S. at 74. But verifying a person's eligibility for employment in this country has nothing to do with foreign affairs. As for *Georgia Latino Alliance for Human Rights v. Governor*, 691 F.3d 1250, 1263-64 & n.10 (11th Cir. 2012), it holds that Congress intended to occupy "the field of regulating the harboring and concealment

16

of unlawfully present aliens" because Congress expressly "chose to allow state officials to arrest for [federal] crimes, subject to federal prosecution in federal court," thus establishing its intent "that the role of the states is limited to arrest for violations of federal law." Nothing comparable is found in "'the text and structure of the statute at issue'" here. *Kansas*, 589 U.S. at 208.

### C. The challenged provisions of the Privacy Act are not an obstacle to the accomplishment and execution of Congress's full purposes and objectives.

Having failed to land a blow with its express and field preemption arguments, the federal government turns to a last-gasp effort based on the one remaining category: conflict preemption. But here too it misses the mark. While the federal government speculates that the Privacy Act *could* frustrate Congress's objectives in restricting the employment of unauthorized workers, it fails to provide any evidence, or even allege, that the state law *in fact* has had this effect.

### 1. The federal government cannot show that the challenged provisions of the Privacy Act cause major damage to substantial federal interests.

Like field preemption, conflict preemption must be implied from the text and structure of a federal statute. The Supreme Court "ha[s] found implied conflict pre-emption [1] where it is impossible for a private party to comply with both state and federal requirements or [2] where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (cleaned up). The federal government's conflict preemption argument aims for the latter category; it does not contend that it is impossible to comply with both the Privacy Act and the Immigration and Nationality Act but rather that the state statute "Frustrates Congress's Objectives." ECF 18 at 18.

To succeed on this theory, the federal government "must show that applying the" challenged provisions of the Privacy Act "'would do "major damage" to clear and substantial federal interests.'" *McHenry County v. Raoul*, 44 F.4th 581, 591 (7th Cir 2022) (quoting *C.Y.*

*Wholesale*, 965 F.3d at 547); *see Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1103 (7th Cir. 2024) (state law preempted because it "'would render'" federal law "'meaningless'"). This inquiry too "must be grounded 'in the text and structure of the'" Immigration and Nationality Act. *Kansas*, 589 U.S. at 208. Conflict "preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Whiting*, 563 U.S. at 607.

Overlap between state and federal law does not suffice: "States may generally regulate the same conduct the Federal Government does," and "the 'possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption.'" *Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 335 (5th Cir. 2025) (quoting *Kansas*, 589 U.S. at 212). Further, "[p]roviding redress for a civil wrong under state law does not create a conflict with a distinct 'federal remedial scheme'"; to the contrary, "State law often provides remedies federal law does not." *Id.* (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 257 (1984), and citing *California v. ARC America Corp.*, 490 U.S. 93 (1989)).

What counts as "a sufficient obstacle" to justify preempting a state law "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). But conflict preemption is not a license to speculate about imaginary obstacles cut out of whole cloth. As its name indicates, conflict preemption "turns on the identification of [an] 'actual conflict'" between state law and federal law. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000). "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). And

because "the teaching of [the Supreme] Court's decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists," a theoretical clash based solely on untested assumptions about how private actors might respond to overlapping state and federal regulations "is simply too speculative a basis on which to rest a finding of pre-emption." *English v. General Electric Co.*, 496 U.S. 72, 90 (1990) (cleaned up); *see Montana Medical Association v. Knudsen*, 119 F.4th 618, 626 (9th Cir. 2024) (state law was not preempted given "lack [of] information [in the record] about specific [responses to the law in] specific [ ] settings").

### 2. Mere differences between state and federal law are insufficient to establish conflict preemption.

The conflict preemption argument stumbles immediately out of the gate. The federal government spills two pages of ink cataloging the various ways in which it perceives the challenged provisions of the Privacy Act to differ from 8 U.S.C. § 1324a(b), which concerns Form I-9, and section 403(a) of Public Law 104-208, which concerns E-Verify. ECF 18 at 18-20. Most of the alleged "conflicts" that the federal government identifies are not differences in what state and federal regulations ***require*** of employers but rather differences in how to handle violations. Regardless, this "argument is simplistic; mere differences between state and federal regulation of the same subject are not conclusive of preemption." *MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir. 1980). Rather, "the crucial inquiry is whether [state law] differs from [federal law] in such a way that achievement of the congressional objective [ ] is frustrated." *Id.*; *see Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1034 (7th Cir. 2008).

The federal government offers no persuasive allegations or evidence that the minor differences between the Privacy Act and federal law "would do 'major damage'" to Congress's statutory objectives. *McHenry County*, 44 F.4th at 591. It merely says that these differences matter because the requirements set forth in the Privacy Act are "'not the system Congress

19

created,'" ECF 18 at 20 (quoting *Arizona*, 567 U.S. at 408), and "'undermine[ ] the congressional calibration of force,'" *id.* (quoting *Crosby*, 530 U.S. at 380). But this sounds like a tautology: "the differences between state and federal law matter because state and federal law are different."

A close reading of the government's cited cases reveals, unsurprisingly, that they do not support this circular reasoning; rather, those cases demonstrate that conflict preemption requires something beyond mere differences between the laws. The state law at issue in *Arizona* "authoriz[ed] state officers to decide whether an alien should be detained for being removable." 567 U.S. at 409. This created a conflict with federal immigration law, the Supreme Court reasoned, because the state law "violates the principle that the removal process is entrusted to the discretion of the Federal Government": removal decisions "require[ ] a determination whether it is appropriate to allow a foreign national to continue living in the United States" and therefore "touch on foreign relations and must be made with one voice." *Id.* The state law at issue in *Crosby* also touched on foreign relations: "the differences between the state and federal Acts in scope and type of sanctions" imposed on the nation of Burma (now Myanmar) not only "threaten[ed] to complicate [diplomatic] discussions" but also "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." 530 U.S. at 381. Of course, none of this has any relevance here: the Privacy Act does not "touch on foreign relations," and there is no need for our nation to speak with "one voice" in dealing with the protections that Illinois employees are entitled to in the workplace.[8]

---

[8] The federal government seems to suggest that these differences somehow interfere with the "Congressional goal . . . to preserve jobs for American workers" (although it does not explain how). ECF 18 at 21. This is a nonstarter: as explained, the challenged portions of the Privacy Act **protect** American workers (and others whom the federal government has authorized to work in this country) by ensuring that they are not excluded from employment because of errors in verifying their eligibility.

### 3. A hypothetical conflict is insufficient to preempt state law.

At the tail end of its argument, the federal government finally addresses the correct conflict preemption standard. Recall, it "must show that applying the" challenged provisions of the Privacy Act "would do 'major damage' to clear and substantial federal interests." *McHenry County*, 44 F.4th at 591. A recent Seventh Circuit case illustrates the heavy burden this rule imposes: it found conflict preemption only because the challenged state law "'would render'" a provision of federal law "'meaningless.'" *Petr*, 95 F.4th at 1103.

The federal government points to two ways in which it thinks the Privacy Act does major damage to substantial federal interests. *First*, it says, the state law "has made E-Verify compliance more challenging and has raised the hurdles for employers to implement this system," thus "mak[ing] it less likely that Illinois employers will use E-Verify" and "frustrating the purpose of Section 1324a, which seeks to deter and eliminate unauthorized employment in the United States." ECF 18 at 21. *Second*, the federal government continues, the state law "obstructs Congress's intent to eradicate unlawful employment of aliens in the United States" by requiring employers to provide advance notice of Form I-9 inspections, which "could prompt an employee who is working unlawfully . . . not to show up to work on the day of inspection, and to abscond indefinitely in order avoid detection by immigration authorities." *Id.* at 21-22.

Both arguments miss the mark. Begin with the federal government's concerns about discouraging E-Verify use: contrary to Supreme Court caselaw, this is a hypothetical conflict based on rampant speculation. *See English*, 496 U.S. at 90; *Rice*, 458 U.S. at 659. Worse, some of the challenged provisions of the Privacy Act have been in place in virtually identical form for fifteen years. *See* Illinois Public Act 96-623. Even the newer provisions have been the law for months. The federal government maintains records on E-Verify usage; it would know if the state

21

law was causing Illinois employers to flee the program and could establish it with evidence—or allege it with certainty.[9] That it hasn't even tried should tell the Court all it needs to know. *See, e.g.*, *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (likelihood of success on the merits "normally includes a demonstration of how the applicant proposes to prove the key elements of its case"); *Smith & Wesson*, 145 S. Ct. at 1568 (factual allegations based on mere "speculation" are "not enough" to survive "a motion to dismiss").

There is more: setting aside the federal government's speculation about how employers will respond to the Privacy Act, it does not follow that decreased usage of E-Verify would frustrate Congress's purpose "to deter and eliminate unauthorized employment in the United States." ECF 18 at 21. For one thing, Congress chose not to require employers to participate in the E-Verify program. Public Law 104-208, §§ 402(a), 403(a). The only available inference is that Congress thought E-Verify was not necessary to achieve its goal of eliminating unauthorized employment. *See McHenry County*, 44 F.4th at 591 (when statutory text "demonstrates at most a general preference" of Congress, that "is not enough to support a [conflict] preemption claim").

Congress's judgment makes sense given that it has separately required employers to verify employment eligibility using the Form I-9 process. 8 U.S.C. § 1324a(b); *see Lozano v. Hazleton*, 724 F.3d 297, 309-10 (3d Cir. 2013) (recognizing "the importance of the I-9 process to the federal scheme"). On top of this, substantial civil and criminal penalties for employing unauthorized workers will continue to deter most Illinois employers from hiring them. *E.g.*, 8 U.S.C. § 1324a(a)(1), (e)(4), (f)(1); *see Crosby*, 530 U.S. at 373 (conflict preemption requires "examining the federal statute as a whole"). The Supreme Court has made clear that "in the vast

---

[9] *See, e.g.*, U.S. Citizenship and Immigration Services, "E-Verify Usage Statistics," e-verify.gov/about-e-verify/e-verify-data/e-verify-usage-statistics.

majority of cases where federal and state laws overlap," allowing states to enforce their laws "is entirely consistent with federal interests." *Kansas*, 589 U.S. at 212. The federal government has not shown that a longstanding state law requiring employers to take basic steps to prevent undue harm to employees from misuse of E-Verify somehow qualifies as the rare exception to this rule.

Turn next to the federal government's argument that providing notice of Form I-9 inspections "could" cause unauthorized employees to ditch work on the day of the inspection. ECF 18 at 21-22. Those employees' "absence" might "benefit an employer . . . that was knowingly hiring aliens without work authorization," the federal government reasons, "as there would be virtually no evidence for an inspecting entity . . . to evaluate or find, should an inspection turn into an enforcement operation." *Id.* at 22. This too is a theoretical conflict based solely on conjecture. As an initial matter, an employer that seeks to "benefit" from "hiring aliens" by warning them of a Form I-9 inspection could do so regardless of the Privacy Act. And as for employees' evading immigration authorities because they were told about a Form I-9 inspection, that "prospect is simply too speculative a basis on which to rest a finding of preemption." *English*, 496 U.S. at 90; *see Rice*, 458 U.S. at 659. If it was really happening, the federal government would know it and could prove or plead it as fact, not hypothesis. *See, e.g.*, *Illinois Republican Party*, 973 F.3d at 763; *Smith & Wesson*, 145 S. Ct. at 1568.

Perhaps the reason the federal government cannot do so is that the causal chain it postulates doesn't make any sense. It's all premised on the assumption that Form I-9 inspections routinely turn into immigration raids—that the federal officials who arrive to pore over paperwork then stick around to put employees in handcuffs. But there's no reason to suppose this is true. Although an immigration raid requires employees to be present at the worksite, an inspection of documents does not. In fact, federal law authorizes employers to complete and

23

retain electronic versions of Form I-9, which federal officials may inspect remotely. 8 C.F.R.

§ 274a.2(a)(2), (b)(2)(i), (ii), (e)–(i). Even the inspection of paper forms may take place at an

offsite storage location or a federal office building. *Id.* § 274a.2(b)(2)(ii). The implementing

regulations provide no support for the federal government's theory that employees typically are

present during Form I-9 inspections—such that their absence would somehow compromise them.

The federal government's own "fact sheet" about the Form I-9 inspection process

confirms that any subsequent "enforcement operations" do not require employees to be present

during an inspection. "Upon completing [an] inspection of an employer's Form(s) I-9 and any

related supporting documentation," the fact sheet explains, investigators "will notify the

employer of [their] findings in writing by issuing one of" several notices: For example, a "Notice

of Inspection Results" informs employers that they are "in compliance with applicable employee

eligibility verification requirements." A "Notice of Suspect Documents" informs employers that

something seems off about an employee's documents on file but offers "an opportunity to

provide" additional "documentation demonstrating valid U.S. work authorization." And a

"Notice of Intent to Fine" informs employers about a specific violation uncovered during the

Form I-9 inspection that subsequently must be proven in "a hearing."[10] As these notices

illustrate, enforcement operations are based solely on investigators' examination of an

employer's Form I-9s. What the federal government is doing in real life is impossible to square

with its position in this litigation: that an employee's absence during a Form I-9 inspection would

leave its investigators with "virtually no evidence . . . to evaluate or find." ECF 18 at 22.

---

[10] U.S. Immigration and Customs Enforcement, "Form I-9 Inspection," ice.gov/factsheets/i9-inspection;
*see* U.S. Citizenship and Immigration Services, "Handbook for Employers M-274," § 10.3, uscis.gov/i-9-
central/form-i-9-resources/handbook-for-employers-m-274/100-retaining-form-i-9/103-inspection
(outlining employer's obligations during a Form I-9 inspection).

Nevertheless, assume for the sake of argument that the federal government's speculation is sufficient to establish a conflict between state and federal law (it's not) and that the conflict it has conjured up might really be happening (it's not). Still, the Privacy Act's requirement to provide notice of Form I-9 inspections does not "do 'major damage' to clear and substantial federal interests," *C.Y. Wholesale*, 965 F.3d at 547, or "'render'" the federal law that requires employment eligibility verification "'meaningless,'" *Petr*, 95 F.4th at 1103. For starters, the Privacy Act say that employers ***need not give notice*** if the federal government "direct[s] or request[s]" them not to inform employees about an inspection. 820 ILCS 55/13(h). So the federal government is entirely in control of the parade of horribles it suggests the state law would unleash. And, in any event, the federal government does not contend that the state law will encourage employers to cease complying with the requirement to verify their employees' work eligibility in the first place. No wonder: as explained, substantial civil and criminal penalties for employing unauthorized workers will continue to deter most Illinois businesses from hiring them. *E.g.*, 8 U.S.C. § 1324a(a)(1), (e)(4), (f)(1); *see Crosby*, 530 U.S. at 373 (conflict preemption requires "examining the federal statute as a whole"). So, even if some employees fail to show up for work on the day of a Form I-9 inspection, it will barely put a dent in the congressional purpose that the federal government identifies: to "compel employers to verify employment eligibility" and "eliminate unauthorized alien employment." ECF 18 at 20.

## II. The federal government has not submitted evidence supporting its assertion that it is likely to suffer irreparable harm in the absence of an injunction.

Because the federal government is unlikely to succeed on the merits of its preemption claims (and indeed has failed to state a cause of action), this shortcoming is "'decisive'": it is not entitled to a preliminary injunction, and the Court "need not address the remaining elements" necessary to secure one. *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir.

25

2022). But if the Court soldiers on, it should find that the federal government also has failed to establish that it is likely to suffer irreparable harm in the absence of an injunction.

The federal government insists that it has shown irreparable harm because, it says, the challenged provisions of the Privacy Act "are intended to insidiously impede the enforcement of the immigration laws, and they have their intended effect." ECF 18 at 23. But this is just a lawyer's unsworn assertion; it is not supported by any evidence. This omission alone dooms the federal government's motion: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008); *Bevis*, 85 F.4th at 1188 ("The party seeking the injunction bears the burden of showing that this type of relief is warranted.").

The federal government suggests that establishing a supremacy clause violation might on its own suffice to show irreparable harm. ECF 18 at 24. This argument has been rejected, *e.g.*, *Association of American Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 393-95 (D. Md. 2022), because, unlike other constitutional provisions, "the Supremacy Clause is not the source of any federal rights," *Armstrong*, 575 U.S. at 324. And while the federal government's shortcut may have taken hold in some circuits, there do not appear to be any cases in the Seventh Circuit endorsing it. Recent decisions issuing preliminary injunctions based on preemption claims have found irreparable harm in the usual way: by hearing testimony or receiving declarations. *E.g.*, *Illinois Bankers Association v. Raoul*, 760 F. Supp. 3d 636, 663-64 (N.D. Ill. 2024).

In any event, the "irreparable harm" analysis "takes into account how urgent the need for equitable relief really is." *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 788

(7th Cir. 2011). The federal government dallied in filing this lawsuit—fifteen years after many provisions were enacted, nine months after the latest amendments were signed into law in August 2024, and four months after those amendments became effective in January 2025. This unexplained delay undercuts any suggestion that the federal government's harm, if it exists, is truly irreparable. *See, e.g.*, *Delaware State Sportsmen's Association v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 206 (3d Cir. 2024) (four months is too long to wait).

## III. The equities and public interest weigh heavily against preliminary relief.

Finally, balancing the equities and considering the public interest establishes conclusively that the federal government's preliminary injunction motion should be denied. Start with the harm to the people of Illinois if an injunction issues. A state suffers "'irreparable injury'" whenever it "'is enjoined by a court from effectuating statutes enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Put differently, when the party "opposing" an injunction "is the representative of the political branches of a government[,] the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). And the concern that Illinois addressed here is no trifling matter: the people of this state decided that American citizens and residents authorized to work in this country deserve additional protection from false positives that might wrongly flag them as ineligible for employment—and prevent them from earning a living.

The challenged portions of the Privacy Act are a measured response to a serious problem. At its core, the state law requires employers to protect employees' data and notify them when issues arise so there's an opportunity to resolve them. It's common sense—and hardly the burden on Illinois businesses that the federal government makes it out to be. But it is of immense value

to Illinois residents trying to land a job who unjustly get caught up in the massive federal bureaucracy—perhaps because the employee's name or status changed, or because the employer entered the employee's information incorrectly on Form I-9 or in E-Verify, or even because the federal government's own records are wrong. "A rational person could believe that" the Privacy Act "facilitates" the correction of these errors, and that is all that "is necessary to show that an injunction" against the law's enforcement "will impose irreparable harm on the people of" Illinois. *McKenzie v. Chicago*, 118 F.3d 552, 557 (7th Cir. 1997).

On the other hand, the federal government points merely to "speculative harms, which are not enough to tip the balance." *A.C.*, 75 F.4th at 774. Plus, its reasoning is implausible. The challenged portions of the Privacy Act complement sensible measures that the federal government already takes to guard against erroneous determinations: When federal officials issue a "Notice of Suspect Documents" following a Form I-9 inspection, for example, they allow "the employer and employee(s) an opportunity to provide documentation demonstrating valid U.S. work authorization if they believe the finding is in error."[11] And when E-Verify produces a tentative nonconfirmation of an employee's work eligibility, federal law requires the employer to "inform the [employee]" so the employee can contest that finding. Public Law 104-208, § 403(a)(4)(B)(i), (iii). It cannot be the case that, simply by extending similar protections under the Privacy Act, Illinois has somehow upended federal immigration law.

## CONCLUSION

For all these reasons, the Court should deny the federal government's preliminary injunction motion, ECF 18, and dismiss its complaint, ECF 1.

---

[11] U.S. Immigration and Customs Enforcement, "Form I-9 Inspection," ice.gov/factsheets/i9-inspection.

Dated: June 23, 2025

Respectfully submitted,

/s/ Darren Kinkead

Darren Kinkead
Samantha Sherman
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov