**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 1:25-cv-04811 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| STATE OF ILLINOIS et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

It is a maxim of our federalist system that the United States Constitution provides the federal government with "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394, 132 S. Ct. 2492, 2498, 183 L. Ed. 2d 351 (2012); U.S. Const. art. I, § 8, cl. 4. The power and scope of the federal government's authority to legislate in the area of immigration is further reinforced by the Supremacy Clause of the Constitution, which mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. In plain terms, if a state passes a law that intrudes on the federal government's constitutional power over immigration, that law is said to be preempted and rendered null.

But the preemptive effect of the federal government's authority to control matters of immigration is not without limits. A state law is only deemed to be preempted under two circumstances: (1) when Congress declares its intent to preempt state law "through a direct statement in the text of a federal law," *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 546 (7th Cir. 2020) (cleaned up); and (2) when the framework of the federal law shows that Congress has "implicitly ousted the States from regulating in a particular field." *Kansas v. Garcia*, 589 U.S. 191, 208, 140 S. Ct. 791, 804, 206 L. Ed. 2d 146 (2020). Both of these forms of preemption function in the same way: "Congress

1

enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477, 138 S. Ct. 1461, 1480, 200 L. Ed. 2d 854 (2018).

"In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied," courts must start "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194–95, 173 L. Ed. 2d 51 (2009) (cleaned up). One such area of historic power is matters of employment. As noted by the Supreme Court nearly fifty years ago, "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *DeCanas v. Bica*, 424 U.S. 351, 356, 96 S. Ct. 933, 937, 47 L. Ed. 2d 43 (1976). Such authority cannot be abrogated lightly. "Only a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress'" can justify such a conclusion. *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S. Ct. 1210, 1219, 10 L. Ed. 2d 248 (1963).

The case before the Court centers on the extent to which federal immigration law, particularly pertaining to the employment of unauthorized immigrants, preempts a state's ability to legislate in the field of employment. In its complaint, the federal government alleges that over a dozen provisions of the Illinois Right to Privacy in the Workplace Act, 820 ILCS 55/12, 13, and 15 (the "Privacy Act"), which requires (among other non-immigration-related provisions) employers to provide certain protections for employees during the employment eligibility verification process, are preempted by the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat 3359, 338 (codified at 8 U.S.C. § 1324a *et seq.*) ("IRCA"). Quoting Supreme Court precedent, the federal

government argues that the comprehensive framework for "combating the employment of illegal aliens" established by IRCA, which includes the E-Verify program and the Form I-9 employment verification process, both expressly preempts and is frustrated by the protections provided by the Privacy Act, and therefore the state law is unconstitutional under the Supremacy Clause. *Arizona*, 567 U.S. at 404.

At issue before the Court is the federal government's motion to preliminarily enjoin the Privacy Act during the pendency of litigation and a motion by the State of Illinois to dismiss the action in its entirety for failure to state a claim. Because the provisions of the Privacy Act challenged by the federal government are not expressly preempted by IRCA and do not intrude upon the federal government's constitutional powers in the space of immigration and foreign affairs, and because the federal government's broad interpretation of its power to regulate matters of immigration would swallow the historic powers of the states over employment-related issues, the Court grants the State's motion to dismiss and denies the federal government's motion for a preliminary injunction.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529, 131 S. Ct. 1289, 1295, 179 L. Ed. 2d 233 (2011). To survive a motion to dismiss, a plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). When considering dismissal of a complaint, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 167 L. Ed. 2d 1081 (2007) (per curiam). While a plaintiff need not plead "detailed factual allegations" to

3

survive a motion to dismiss, she still must provide more than mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" for her complaint to be considered adequate. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

A preliminary injunction is an extraordinary remedy that is never awarded as a matter of right. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). "A mere possibility of success" is not enough to demonstrate a likelihood of success on the merits; to succeed, a plaintiff must make a "strong showing" that "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). When ruling on a preliminary injunction, "all of the well-pleaded allegations [in the movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).

**Background**

*A. The federal framework governing immigration and the employment eligibility verification process*

Enacted in 1986, IRCA declares it unlawful "for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(1)(a). The law also requires employers to verify the employment authorization status of prospective employees. *Id.* § 1324a(1)(B), (b). This verification requirement is the source of the all-too-familiar Form I-9 employment verification form. As a prerequisite to employment, all prospective employees must complete a Form I-9 that attests to their citizenship, immigration status, and identity as established by documents such as a passport, social security card,

4

or driver's license. *Id.* § 1324a(b). Employers must then verify that the prospective employee is eligible for employment based on this documentation and representations on the I-9 form. *Id.*

In 1996, to assist employers in meeting their legal obligation to verify the employment eligibility of their employees, Congress established what is now known as the "E-Verify" program. *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") §§ 401-405, Pub. L. 104-208, Div. C, Title IV, Subtitle A, 110 Stat., §§ 3009-655 through 3009-666, codified as a note to 8 U.S.C. § 1324a. E-Verify is a voluntary program that enables employers to compare the information on an employee's Form I-9 with federal government records through an online system managed by the Department of Homeland Security. *Id.* § 403. If the employee's Form I-9 information and federal government records do not match, E-Verify sends the employer a "tentative nonconfirmation notice." *Id.* The employer is then required to notify the employee that they received a tentative nonconfirmation and afford the employee the right to contest the notice. *Id.* If the employee contests the tentative nonconfirmation, the employer may not terminate the employee until a nonconfirmation notice becomes final. *Id.*

IRCA also empowers DHS to enforce its requirements through investigations, criminal penalties, and an escalating series of civil penalties. 8 U.S.C. § 1324a(e), (f). Most relevant here, the law also contains a preemption clause, which reads: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." *Id.* § 1324a(h)(2).

B. *The Illinois Right to Privacy in the Workplace Act*

Originally enacted in 1991 through Illinois Public Act 87-107, the Privacy Act covers four main types of privacy-related workplace requirements. First, the act makes it unlawful for an employer or prospective employer to "request, require, or coerce any employee or prospective employee" to

5

provide account credentials "for the purpose of gaining access to the employee's or prospective employee's personal online accounts." "Right to Privacy in the Workplace Act," Illinois Department of Labor ("IDOL"), https://labor.illinois.gov/laws-rules/conmed/privacy-workplace.html (last accessed 8/19/2025).[1] Second, the act "prohibits an employer from refusing to hire, terminate employment, or otherwise disadvantage" any individual because the individual uses "lawful products off the premises of the employer's job site during non-work and non-call hours." *Id.* And third, the act "prohibits employers from making certain inquiries about whether prospective employees have filed claims or received benefits through the Workers' Compensation Act or the Workers' Occupational Diseases Act." *Id.*

It is the fourth type of protection, related to employers' use of "any Electronic Employment Verification System, including the federal E-Verify program," that is challenged by the federal government in this action. Codified at 820 ILCS 55/12, 13, and 15, these sections require employers "using any Electronic Employment Verification System, including the federal E-Verify program . . . to consult IDOL's website and review its legal responsibilities under the Act, which include but are not limited to certain training, posting, and privacy requirements."[2] *Id.*

The Privacy Act is not without teeth. Section 15 of the act lays out methods for enforcing the Privacy Act as a whole, not just the provisions challenged by the federal government in this action. Section 15(b) enables an employee or prospective employee to file a complaint with IDOL if they believe that their rights have been violated. That same section permits IDOL to file a suit against the

---

[1] The Court takes judicial notice of this description from the Illinois Department of Labor website and other state and government websites referenced in this opinion. *See* Fed. R. Evid. 201(b)(2), (d) (explaining that courts may take judicial notice, "at any stage of the proceeding," of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Bost v. Illinois State Bd. of Elections*, 114 F.4th 634 (7th Cir. 2024), cert. granted, No. 24-568, 2025 WL 1549779 (U.S. June 2, 2025) (citing the same).

[2] As the Court notes again later in this opinion, while the federal government broadly refers to the Privacy Act as SB0508, this designation refers to Illinois Public Act 103-879, which amended the Privacy Act to add Section 13 to the statute. Section 12 of the statute has been in place since 2010 through Illinois Public Act 96-623. Section 15 has been in effect, with some amendment to the penalty amounts, since the law was enacted in 1991.

employer in state court, and allows an employee to do the same if IDOL declines to do so. Under Section 15(d), an employee who prevails in their suit may be awarded damages and costs, along with $500 for a willful and knowing violation of Section 12(c) and an escalating series of civil penalties for a willful and knowing violation of Section 13. *Id.* Finally, Section 15(e) makes an employer who violates any provision of the Privacy Act guilty of a petty offense, which is punishable by a fine of up to $1,000. *See* 730 ILCS 5/5-4.5-75(a).

**Discussion**

The federal government sets out two arguments as to why sections 12, 13, and 15 of the Privacy Act are preempted by IRCA. First, it argues that sections 13(h) and 15(b)–(f) of the Privacy Act are expressly preempted by IRCA's preemption clause found in 8 U.S.C. § 1324a(h)(2). Second, it argues that certain provisions of sections 12, 13, and 15 of the Privacy Act are impliedly preempted by Section 1324a of IRCA because they impermissibly intrude on the federal law's comprehensive framework of immigration regulation and create an obstacle to IRCA's statutory purpose. The Court addresses each argument in turn, finding that neither argument survives the State's motion to dismiss.

*A. Express preemption*

Express preemption exists when Congress "declares its intention to preempt state regulation through a direct statement in the text of federal law." *C.Y. Wholesale, Inc,* 965 F.3d at 546. When a federal law contains an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Com. of U.S. v. Whiting,* 563 U.S. 582, 594, 131 S. Ct. 1968, 1977, 179 L. Ed. 2d 1031 (2011). When the text of a preemption clause is ambiguous as to its meaning, "courts favor the interpretation that favors state law." *Id.* This presumption stems from the fact that "given the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the

statute expresses a clear and manifest purpose otherwise." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013) (citing *Wyeth*, 555 U.S. at 565).

In its motion, the federal government argues that sections 13(h) and 15(b)–(f) of the Privacy Act are expressly preempted by Section 1324a(h)(2) of IRCA, which "preempt[s] any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." Because these sections of the Privacy Act "impose criminal and civil penalties on employers of unauthorized aliens," the federal government argues that these sections constitute "sanctions" within the meaning of Section 1324a(h)(2) and do not fall under the licensing exception provided by the provision. (Dkt. 18, *10–13.) Therefore, the sections are expressly preempted by IRCA.[3]

This interpretation of IRCA's preemption clause is broad to the point of absurdity. Recognizing that this is a matter of first impression for the Seventh Circuit, the federal government points to two cases from the Tenth and Eleventh Circuit to support their interpretation of Section 1324a(h)(2). In the first, *Chamber of Commerce of U.S. v. Edmondson*, the plaintiffs sought a preliminary injunction against three provisions of an Oklahoma statute on the grounds that they were expressly preempted by Section 1324a(h)(2). 594 F.3d 742 (10th Cir. 2010). The first provision, Section 7(C), which subjected employers to "cease and desist orders, reinstatement, back pay, costs, and attorneys' fees" for terminating an authorized worker while retaining an employee that the employer knew, or reasonably should have known, was unauthorized to work, was easily enjoined by the court. *Id.* at 754, 765. Because these penalties "were contingent on the employment of an unauthorized alien,"

---

[3] The federal government is inconsistent in arguing which specific provisions of the Privacy Act are expressly preempted. In its motion for preliminary injunction, the federal government specifically mentions sections 13(h) and 15(b)–(f). (Dkt. 18, *11.) But then in its reply, the federal government cites to a rash of other sections of the Privacy Act. (Dkt. 30, *1–5.) This inconsistency extended to oral argument, where the federal government was unable to identify the specific sections that it argued were either expressly or impliedly preempted, and whether those sections were severable under its theory of the law. Preemption is an inquiry that requires precise argument as to the statutory provisions at issue. And the Court is in the business of evaluating arguments set forth by parties, not constructing arguments on their behalf after the fact. As such, the Court limits its analysis to sections 13(h) and 15(b)–(f) of the Privacy Act.

the Tenth Circuit held that they constituted "restrictive measures" that fell within the meaning of "sanctions" as used in § 1324a(h)(2). *Id.* at 766. As such, the plaintiffs were likely to succeed on the merits of their preemption claim.

The second and third provisions, however, survived preemption. Section 7(b) required businesses to use E-Verify to verify the work authorization status of their employees to be eligible for certain state contracts. *Id.* at 753–54. The third provision, Section 9, required businesses to obtain "documentation to verify . . . independent contractor[s'] employment authorization." *Id.* If the contractor could not provide proof of eligibility, the business was required to withhold certain compensation from those contractors. Otherwise, the business would be liable to the state for the money not withheld. *Id.* In both cases, the court found that "whether an independent contractor is an unauthorized alien [w]as of no significance" in determining whether an employer had violated the law. *Id.* at 766. As such, neither provision was expressly preempted by Section 1324a(h)(2).

The federal government exhorts the Court to apply the Tenth Circuit's logic as to Section 7(C) of the Oklahoma law to the Privacy Act and stop there. But the provisions of the Privacy Act challenged by the federal government are clearly more analogous to the Tenth Circuit's analysis of Section 7(B) and Section 9 of the Oklahoma statute. As was the case in *Edmondson*, none of the provisions of the Privacy Act impose penalties on employers who "employ, or recruit or refer for a fee for employment, unauthorized aliens" as stated by the plain wording of Section 1324a(h)(2). Instead, under the Privacy Act, a person's immigration or work authorization status is irrelevant to determine whether an employer has violated any of the provisions of the act. As such, the sections cannot be said to be expressly preempted by IRCA.

The second case the federal government cites in support of its argument, *United States v. Alabama*, fairs no better. 691 F.3d 1269 (11th Cir. 2012). There, the Eleventh Circuit found that a law that authorized "'restrictive measures'—compensatory damages, mandatory attorneys' fees, and

mandatory court costs—to punish a 'specific action'—hiring or retaining an unauthorized employee"
was "clearly intended to punish the employment of unauthorized aliens" and therefore preempted by
Section 1324a(h)(2). *Id.* at 1290–91. But as was the case with Section 7(C) of the Oklahoma statute
in *Edmondson*, this law punished the specific act of hiring a person who was not authorized to work in
the United States, not the employment of workers in general. As such, it is a poor analogue to the
provisions of the Privacy Act at issue here.

By its plain wording, it is clear that the preemption clause of Section 1324a(h)(2) is limited to
state laws that impose sanctions on the hiring of persons without status. But common sense also
demands the same result. The broad interpretation suggested by the federal government—that any
state law that relates to federal employment verification systems is preempted by Section 1324a(h)(2)
because it touches and concerns workers who may not have authorization—would sweep in all
manner of employee-protection laws, not to mention any state law that mandated the use of E-Verify.
*See, e.g.*, Fla. Stat. § 448.095 (imposing $1,000 fine on an employer that "fail[s] to use the E-Verify
system as required under this section"). And as has been said in many a court in this country, "Statutes
have to be interpreted to avoid absurd results." *Senne v. Vill. of Palatine, Illinois*, 784 F.3d 444, 447 (7th
Cir. 2015). Accordingly, the Court grants the State's motion to dismiss as to the federal government's
argument that the Privacy Act is expressly preempted by IRCA.

*B. Implied preemption*

Implied preemption comes in two flavors: field preemption and conflict preemption. Field
preemption "arises when the federal regulatory scheme is so pervasive or the federal interest so
dominant that it may be inferred that Congress intended to occupy the entire legislative field." *Patriotic
Veterans, Inc.*, 736 F.3d at 1049. Conflict preemption "arises when state law conflicts with federal law
to the extent that "compliance with both federal and state regulations is a physical impossibility," or

10

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

"Neither of these implied preemption doctrines can be lightly applied." *Id.* The "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Id.* (citing *Whiting*, 563 U.S. at 607). All together, "a high threshold must be met if a state law is to be preempted for conflicting with a purpose of a federal Act." *Whiting*, 563 U.S. at 607.

It is with this level of caution that the Court addresses the federal government's arguments for both field and conflict preemption.

      a. *Field preemption*

"Field preemption is rare." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 651 (7th Cir. 2019). It occurs only "[i]n rare cases" where Congress has "legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas*, 589 U.S. at 208. Accordingly, "field preemption is confined to only a few areas of the law." *Nelson*, 928 F.3d at 651. Employment is not one of those areas.

"To determine whether Congress has implicitly ousted the States from regulating in a particular field, [courts] must first identify the field in which this is said to have occurred." *Id.* For the federal government, the field in question is "the administrative processes governing (1) Form I-9 documentation and inspection, and (2) E-Verify." (Dkt. 18, *13.) Through the Form I-9 process established by IRCA and the E-Verify program under IIRIRA, the federal government argues that "the federal government has set up a comprehensive 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it,' even through 'complementary state regulation.'" (*Id.*) (quoting *Arizona*, 567 U.S. at 399, 401) (cleaned up)). "By imposing additional

notification requirements and civil a[s] well as criminal penalties," the federal government argues that the Privacy Act "impermissibly usurps and alters" this field of regulation. (*Id.*)

According to the federal government, the imposition caused by the Privacy Act is analogous to the statute at issue in *Arizona v. United States*. There, Arizona law forbade the "willful failure to complete or carry an alien registration document . . . in violation of 8 United Staes Code § 1304(e) or 1306(a)." 567 U.S. at 400. Citing to its earlier decision in *Hines v. Davidowitz*, 312 U.S. 52, 61 S. Ct. 399, 85 L. Ed. 581 (1941), which concerned an effort by Pennsylvania to establish its own alien registration system, the Supreme Court held that the federal government had "occupied the field of alien registration" by "provid[ing] a full set of standards governing alien registration, including the punishment for noncompliance." *Id.* Here, the federal government argues that "by imposing requirements on employers' use of employment eligibility verification systems (Section 12), restrictions on their use of the same (Section 13), and impos[ing] sanctions for violations of SB0508 (Section 15)," the Privacy Act similarly intrudes on the federal employment eligibility verification system established by IRCA.[4] (Dkt. 18, *18.)

This argument fails in the face of Supreme Court precedent. Federal law may "make a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders." *Kansas*, 589 U.S. at 806. But IRCA does not "exclude a state from the entire field of employment verification." *Id.* Just as IRCA "does not create a comprehensive and unified system regarding the information that a State may require employees to provide," *Id.*, the

---

[4] As the Court noted in the previous section on express preemption, the federal government continues to play fast and loose in identifying what provisions of the Privacy Act are field preempted by IRCA. While in the quoted sentence it suggests that the entirety of sections 12, 13, and 15 are preempted, in its motion it identifies Section 12(c)(5) and (6), 13(c), (d), and (e), and 15(d)(3), (4) and (e). While describing the Privacy Act with the catchall "SB0508" or "the challenged provisions" may be expedient when drafting, it comes at the cost of precision in argument, a contributing factor in the failure of the federal government's complaint and motion.

federal statute does not place a limit on the information and protections a state may require employers to provide to prospective and current employees during the employment verification process.

Even accepting the federal government's contention that the Form I-9 verification process provided by IRCA creates a federal field of employment verification, the Privacy Act does not prohibit the use of I-9 forms or modify which federal documents are permissible forms of verification. Rather, the act requires employers to notify employees in writing if there is a discrepancy in their work authorization information, explain their right to correct this discrepancy and to contest a subsequent federal determination of nonconfirmation, and permit the employee to have a representative of their choosing in subsequent meetings or discussions with the employer. 820 ILCS 55/13(c), (d). None of these requirements, or others in the Privacy Act, intrude upon the sacrosanct field of federal immigration law. Instead, the provisions sit squarely within states' historic powers to regulate issues of employment.

The same can be said about any preemptive effect of the E-Verify program. It is undisputed that the Privacy Act contains provisions that concern an employer's use of E-Verify. But as the Supreme Court explained over ten years ago, "The IIRIRA provision setting up E-Verify contains no language circumscribing state action." *Whiting*, 563 U.S. at 608. The provision does, however, constrain federal action; "[a]bsent a prior violation of federal law 'the Secretary of Homeland Security may not require any person or other entity [outside of the Federal Government] to participate in a pilot program' such as E–Verify." *Id.* (explaining that states are not preempted from mandating that employers use E-Verify). If anything, Congress's decision to make E-Verify voluntary for employers evidences an intent to *not* occupy the field of employment verification.

In setting forth requirements employers must follow in the employment verification process, the Privacy Act represents an "exercise of the historic police powers of the States" in regulating the employment relationship in the state. *Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 147. Having failed

to identify a "clear and manifest purpose of Congress" to preempt state action in this space, the federal government's argument that the Privacy Act is field preempted by IRCA fails. Accordingly, the Court grants the State's motion to dismiss as to the federal government's argument that the Privacy Act is field preempted by IRCA.

    *b.   Conflict preemption*

As the Court explained earlier, conflict preemption can occur where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (cleaned up). To succeed in an argument of conflict preemption, the moving party "must show that applying the state law would do 'major damage' to clear and substantial federal interests." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *C.Y. Wholesale, Inc.*, 965 F.3d at 547). Applied here, "the crucial inquiry" is whether the Privacy Act differs from IRCA "in such a way that the achievement of the congressional objective" of the federal law is frustrated. *MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir. 1980).

The federal government argues that "[t]he goal of 8 U.S.C. § 1324a is simple: to compel employers to verify employment eligibility—in line with Congressional intent to eliminate unauthorized alien employment—and to encourage the use of E-Verify," and that "at the heart of this Congressional goal is the desire to preserve jobs for American workers." (Dkt. 18, *20.) (citing *I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194, 112 S. Ct. 551, 558, 116 L. Ed. 2d 546 (1991) (describing "preserv[ing] jobs for American workers" as a "primary purpose in restricting immigration"). It then goes on to make much hay out of the differences between IRCA and the Privacy Act, namely concerning the latter's employee notification requirements, 820 ILCS 55/12(c)(6), 13(c), (d), (e), and (g), and corresponding sanctions, 820 ILCS 55/13(h), 15(b)–(f). Because "[t]he main focus of the federal immigration scheme embodied in § 1324a is to deter unauthorized employment and to make employers responsible and accountable in that regard—not to protect

14

employees," Dkt. 30, *12, the federal government argues that by adding these requirements, the Privacy Act disturbs Congress's "carefully reticulated scheme of requirements and penalties." (Dkt. 18, *21.)

But "mere differences between state and federal regulation of the same subject are not conclusive of preemption." *MITE Corp.*, 633 F.2d at 493; *see also Kansas*, 589 U.S. at 211 (explaining that the mere fact that a state law "overlaps to some degree" with a federal law "does not even begin to make a case for conflict preemption"). It does not follow that requiring employers to protect the rights of employees—Americans and those who are authorized to work in this country—does such major damage as to create an obstacle to Congress's goal of "preserving jobs for American workers." Nor are these provisions analogous to the Massachusetts law at issue in *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 376–78, 120 S. Ct. 2288, 2296–97 147 L. Ed. 2d 352 (2000), which intruded on the President's "intended statutory authority . . . to restrain fully the coercive power of the national economy" by imposing sanctions on the government of Burma, or that in *Arizona v. United States*, which "interfere[d] with the careful balance struck by Congress with respect to unauthorized employment of aliens" by "impos[ing] criminal penalties on aliens who seek or engage in unauthorized employment." 567 U.S. at 404–07. And while preemption arguments "must be grounded in the text and structure of the statute at issue," *Kansas*, 589 U.S. at 208, the federal government points to no legislative history to suggest that Congress specifically intended *not* to include such employee protection requirements in crafting IRCA. *See Arizona*, 132 U.S. at 405–407 (drawing on legislative history to support the conclusion that "[t]he legislative background of IRCA underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment").

In addition to highlighting, in vain, the differences between IRCA and the Privacy Act, the federal government argues that the effect and purpose of certain provisions of the Privacy Act

"frustrates the purpose of Section 1324a, which seeks to deter and eliminate unauthorized employment in the United States." (Dkt. 18, *21.) First, the federal government argues that the Privacy Act "essentially has made E-Verify compliance more challenging and has raised hurdles for employers to implement this system," which "makes it less likely that Illinois employers will use E-Verify." *Id.* Second, it argues that the advanced warning provisions "directly obstructs Congress's purpose of ensuring lawful employment in the United States" because they could prompt employees to "abscond indefinitely in order to avoid detection by immigration authorities." *Id.*

Each of these conflicts, however, is based on nothing but speculation. And "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of [a] state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S. Ct. 3294, 3299, 73 L. Ed. 2d 1042 (1982). As the federal government notes in its briefings, the E-Verify system is managed by the Department of Homeland Security, which tracks E-Verify enrollment and usage at the state level. "E-Verify Usage Statistics," E-Verify, https://www.e-verify.gov/about-e-verify/e-verify-data/e-verify-usage-statistics (last accessed 8/19/2025). While Section 13 of the Privacy Act only went into effect in January 2025, Section 12 has been in place since 2010. If the state law was having the discouraging effect alleged by the federal government, it easily could have presented such information. While the Court is mindful that a party need not plead its entire case to survive a motion to dismiss, a complaint must nevertheless contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Here, the federal government has alleged no facts at all to support an inference that the Privacy Act has had a discouraging effect on E-Verify enrollment in Illinois such that the law is in conflict with Congress's purpose in establishing the program.

The same is true of the federal government's allegation that the point of the advanced-warning provision is to obstruct federal immigration enforcement by giving unauthorized workers an opportunity to evade detection by immigration authorities such as U.S. Immigration and Customs

Enforcement. As well as being "simply too speculative a basis on which to rest a finding of pre-emption," *English v. Gen. Elec. Co.*, 496 U.S. 72, 90, 110 S. Ct. 2270, 2281, 110 L. Ed. 2d 65 (1990), this concern conflates the priorities of the federal government, which has made no secret of its goal of aggressively pursuing the detention and deportation of immigrants without legal status in this country, *see, e.g.*, "Recent White House Actions on Immigration," Congress.gov, https://www.congress.gov/crs-product/LSB11265 (last accessed 8/19/2025), with the core inquiry at hand—Congress's intent in passing IRCA. It is not enough to "[i]nvoke[e] some brooding federal interest" to prove preemption of a state law; only an actual conflict with a federal statute will suffice. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 768, 139 S. Ct. 1894, 1901, 204 L. Ed. 2d 377 (2019).

"Pre-emption is ordinarily not to be implied absent an 'actual conflict.'" *English*, 496 U.S. at 90 (citation omitted). And "[t]he teaching of [the Supreme] Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists." *Id.* (citation omitted). Accordingly, the Court grants the State's motion to dismiss as to the federal government's argument that the Privacy Act is conflict preempted by IRCA.

**Conclusion**

For the reasons stated in this opinion, the Court grants Defendants' motion to dismiss [25] and denies Plaintiff's motion for preliminary injunction [18].

**IT IS SO ORDERED.**

Date: 8/19/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge